**UNITED STATES v. SNYDER.**
**REUL v. SNYDER.**

Nos. 9848, 9849.

United States Court of Appeals
District of Columbia Circuit.

Argued March 18, 1949.

Decided July 5, 1949.

Before CLARK, PRETTYMAN and PROCTOR, Circuit Judges.

PRETTYMAN, Circuit Judge.

These are two appeals from a judgment of the District Court of the United States for the District of Columbia.

Charles Richard Snyder was in the service of the United States Navy. He applied for and was granted two policies of National Service Life Insurance and, by proper documents, designated as his principal beneficiary Madeleine Ursula Snyder, described by him as his "wife", and as his "contingent beneficiary" his sister, Dorothy Helen Reul. Snyder was killed. Both Madeleine Ursula Snyder and Dorothy Helen Reul presented to the Veterans Administration claims for payment of the proceeds of the insurance policies. The former alleged that she was the widow of the insured, and the latter denied that allegation. The Veterans Administration denied the claim of the alleged widow. Thereupon she sued the United States.[1] The United States answered and stated, among other things, that it admitted liability in the sum of $10,000 to the beneficiary lawfully entitled thereto but, because of the conflicting claims, it could not safely make payment to either without the aid of the court, and it prayed that the sister, Dorothy Helen Reul, be made a party defendant. The court granted the prayer, and the new third-party defendant answered the complaint, alleging, among other things, that at the time of the alleged marriage of the plaintiff to Charles Richard Snyder, she (the plaintiff) was already married to James John Ford, from whom she had obtained a decree of divorce in Mexico, which decree was invalid; therefore, said the third-party defendant, the plaintiff was not within the class of beneficiaries permitted to be designated in a policy of National Service Life Insurance.

The case went to trial. The pertinent facts were stipulated. The plaintiff, then Madeleine Ursula Bradley, was married on

Mr. Morton Hollander, Attorney, Department of Justice, Washington, D. C., for appellant United States of America. Mr. H. Graham Morison, Assistant Attorney General, Mr. George Morris Fay, United States Attorney, and Mr. Samuel D. Slade, Attorney, Department of Justice, Washington, D. C., were on the brief for appellant United States of America. Messrs. Peter C. Charuhas and William Clarence Brewer, Attorneys, Department of Justice, and Mr. Sidney S. Sachs, Assistant United States Attorney, Washington, D. C., also entered appearances for appellant United States of America.

Mr. Benjamin C. Sigal, Washington, D. C., for appellant Reul.

Mr. John Geyer Tausig, Washington, D. C., with whom Mr. Gibbs L. Baker, Washington, D. C., was on the brief, for appellee.

---

[1] Sec. 19 of an act of June 7, 1924, 43 Stat. 612, as amended, 38 U.S.C.A. § 445; Sec. 617, Part. I, Title VI of an act of Oct. 8, 1940, 54 Stat. 1014, as amended, 38 U.S.C.A. § 817.

October 4, 1937, to James John Ford in Lansdowne, Pennsylvania. Thereafter they lived together in New Jersey until November 15, 1944, when they separated and did not live together thereafter. She continued to reside in New Jersey, and he moved to Florida. In May, 1945, a decree of divorce purporting to dissolve their marriage was entered in the First Civil Court of the Bravos District in the State of Chihuahua, Mexico. Neither party was a resident of or domiciled in Mexico, all negotiations were handled through correspondence, and both parties appeared in the proceeding only by attorneys.

On July 3, 1945, the plaintiff, Madeleine Bradley Ford, was married to Charles Richard Snyder (the insured in the present case) at Elkton, Maryland. Thereafter they lived together in New Jersey until his death March 10, 1946.

The District Court was of the view that, even assuming invalidity of the Mexican divorce, the validity of the second marriage must be determined by the law of Maryland, the state where it was celebrated, and that, under the law of Maryland, in a case where the impediment to a valid marriage consists of a prior existing marriage, a second marriage is not void but only voidable and may be voided only in an action instituted by one of the parties to the marriage. That court therefore concluded that the validity of the marriage of the plaintiff and the insured in the present case could not be attacked collaterally in the pending action, and that, therefore, the plaintiff must be regarded as the widow of the insured.

The plaintiff, Madeleine Ursula Snyder, argues that she was the de facto wife of the deceased insured and, therefore, is his widow within the meaning of the statute. She further argues that if, in order to qualify as the beneficiary, she must be the de jure as well as the de facto widow, her de jure status may be determined either by the law of the place of the marriage or by the law of the domicile of the parties. She contends that under the law of Maryland, and also under the law of New Jersey, a marriage valid where celebrated is valid everywhere and that, even if her Mexican divorce was invalid in Maryland, her marriage to the deceased insured was not void but merely voidable in that State.

The National Service Life Insurance Act,[2] in so far as here pertinent, provides: "The insurance shall be payable only to a widow * * *. The insured shall have the right to designate the beneficiary or beneficiaries of the insurance, but only within the classes herein provided * * *."

The question before us, therefore, is: Was Madeleine Ursula Snyder the widow of Charles Richard Snyder at the time of the latter's death, within the meaning of the word "widow" as it appears in this federal statute? The answer depends upon whether she was validly married to him at the time of his death.

The validity of marriages is no new problem in veterans' affairs. In 1882 Congress provided that "Marriages * * * shall be proven in pension cases to be legal marriages according to the law of the place where the parties resided at the time of marriage or at the time when the right to pension accrued; * * *."[3] The same rule appeared in the War Risk Insurance Act of October 6, 1917,[4] and there related to compensation and insurance. The World War Veterans' Act, 1924, which pertained to insurance and other benefits, provided that the marriage of a claimant should be shown by such testimony as the Director of the Veterans' Bureau might prescribe by regulations,[5] and he promulgated a regulation[6] using the language employed in the War Risk Insurance Act of 1917. Reference to the law of the place where the marriage was celebrated was used by Congress for the first

---

[2] Sec. 602(g), Part I, Title VI, of an act of Oct. 8, 1940, 54 Stat. 1010, 38 U.S.C.A. § 802(g). This section was amended by an act of Aug. 1, 1946, 60 Stat. 782, 38 U.S.C.A. § 802(g), but the amendment is not applicable in this case.

[3] 22 Stat. 345, 38 U.S.C.A. § 199.

[4] Sec. 22(5), 40 Stat. 401.

[5] Sec. 20 of the Act, 43 Stat. 613, 38 U.S.C.A. § 446.

[6] Veterans Bureau Regulation No. 75 (effective Sept. 4, 1924), Sec. 34.

time in an act of August 16, 1937.[7] Within a year, the reference was eliminated, and the exclusive residence test was restored.[8]

The course of the regulations of the Veterans Administration followed generally the course of the acts of Congress. Upon publication of the Code of Federal Regulations in 1939, containing regulations in effect June 1, 1938, the outstanding rule of the Veterans Administration relating to proof of validity of marriages contained the place-of-ceremony provision.[9] On March 6, 1939, that provision was eliminated from the regulations by an amendment.[10] These regulations at that time related to the adjudication of veterans' claims for compensation and pension.[11]

The National Service Life Insurance Act of 1940,[12] which is the act involved in the case at bar, contained no specific provision concerning proof of validity of marriage, but it gave the Administrator wide powers to make regulations.[13] On November 9, 1944, the Administrator added to his regulations on insurance a cross reference which incorporated into those regulations the then outstanding rule as to validity of marriages in compensation and pension cases.[14] Thus, the regulations of the Administrator under the National Service Life Insurance Act provide: "All marriages shall be proved as valid according to the law of the place where the parties resided at the time of marriage, or at the time and place where the parties resided when rights to compensation or pension accrued."

■ That regulation has sound basis in congressional history and in the history of veterans' affairs. It certainly is not inconsistent with the statute. Moreover, its harmony with congressional intent is conclusively shown by the action of Congress in putting the place-of-ceremony provision into the statute and then taking it out.

■ It is our conclusion that the meaning of the word "widow", as it appears in the Act, is to be determined according to the provisions of the regulation. When the question involves the validity of a marriage, that validity is to be proven, for this purpose, by the law of the place where the parties resided at the time of the marriage or at the time the claim accrued.

At the time of the marriage here involved, both the plaintiff and the insured resided in New Jersey, and they were residing there when he died. Hence the law of that state applies.

The law of New Jersey was stated by the United States Court of Appeals for the Third Circuit in Sherman v. Federal Security Agency.[15] That case involved a claim to a widow's insurance benefit under a federal statute. The plaintiff and the insured, both residents of New York, were married in Connecticut, returned to New York, and sometime later moved to New Jersey, where they continued to reside until the death of the insured. Prior to the marriage ceremony, the plaintiff had obtained a Mexican divorce from her former husband. Neither party to that proceeding had ever gone to Mexico. The court said:

"It is perfectly clear that the courts of New Jersey, when the question is presented to them for decision, will treat as absolutely void a divorce granted by a court in a foreign state in which neither of the parties was a bona fide resident. [Citing cases.] * * *.

"Likewise New Jersey adheres to the universal rule that the act of going through a ceremonial marriage does not create the marriage relation if one of the parties has an impediment such as an existing marriage with a third person. [Citing cases.]"

The court concluded that the Mexican

---

[7] Sec. 4(c), 50 Stat. 661.

[8] Sec. 3 of an act of May 13, 1938, 52 Stat. 353, 38 U.S.C.A. § 505a.

[9] 38 Code Fed.Regs. § 2.1049 (1939).

[10] 4 Fed.Reg. 1157, 38 Code Fed.Regs. § 2.1049 (Cum.Supp.1944).

[11] Part 2 of Title 38, Code of Federal Regulations, relates to this subject.

[12] Part I, Title VI, of an act of Oct. 8, 1940, 54 Stat. 1008, 38 U.S.C.A. § 801 et seq.

[13] Sec. 608 of the Act, 54 Stat. 1012, 38 U.S.C.A. § 808.

[14] 9 Fed.Reg. 13668, 38 Code Fed.Regs. § 10.3453 (Supp. 1944).

[15] 1948, 166 F.2d 451, 453.

divorce and the subsequent bigamous marriage there involved were void and that the plaintiff was still the wife of her first husband and not the widow of the insured.[16]

The plaintiff argues that the decision of the Orphans' Court of Ocean County, New Jersey, "In the Matter of the Estate of Charles R. Snyder" [17] conclusively establishes that she is the widow of the insured. That proceeding involved a petition to set aside letters of administration granted to Dorothy Helen Reul, one of the present appellants. The court set aside the letters and granted them to the petitioner, plaintiff-appellee here. But the court stated: "In taking this action I am disregarding the evidence relating to the Mexican Divorce deeming it outside the jurisdiction of the Orphans' Court to rule upon the legality thereof." It is apparent that the validity of the plaintiff's marriage to the insured was not judicially determined by that opinion and that under New Jersey law, as set out in Sherman v. Federal Security Agency, supra, the plaintiff is not the widow of the insured.

The District Court applied to this case the general rule applicable to marriages, that, if valid where performed, they are valid everywhere. Thus, it held the law of Maryland to control. The court mentioned exceptions to the usual rule, one exception being polygamous marriages, but it thought the marriage in the present case not to be within that class. True, this one was bigamous (if the divorce was invalid) rather than polygamous, but we think that the public policy which creates a general exception to the usual rule relates to bigamy as to polygamy. Moreover, we think that the court erred as to the law of Maryland in the situation before us. It relied upon Ridgely v. Ridgely [18] as determinative of the law of Maryland upon the issue. It was of opinion that that case required the conclusion that in Maryland the validity of a second marriage could not be attacked collaterally, that is, it could be attacked only in an action brought for the purpose by one of the parties to the second marriage. We are of the view that the decision and opinion in Ridgely v. Ridgely do not support the conclusion drawn from it. That case went to the appellate court from a judgment upon a demurrer. The suit was brought in a circuit court of Baltimore City by the first husband of a woman who had secured an alleged divorce from him in South Dakota and thereafter contracted a second marriage. The first husband sought by an equity action to have the second marriage annulled. The court held, upon an extensive examination of the intricate development of the procedural law in Maryland, that jurisdiction to annul a marriage upon grounds other than fraud was in the Superior Court (a law court) and that suits in equity for annulment upon the ground of fraud were limited by statutory specification to suits by one of the parties to the marriage.

On the other hand, in a case in 1828,[19] the Court of Chancery in Maryland had before it the claims of children to the property of a deceased. It appeared that their mother had been married and, that marriage undissolved and her husband living, had married again. They were the issue of the later marriage. The court in a careful opinion pointed out that while no suit would lie to annul the later marriage, "wherever the validity of a marriage or the legitimacy of a party forms a component part of the matter in controversy, it becomes indispensably necessary, that the Court should inquire into and determine upon that fact, as well as every other part of the case; * * *." The later marriage was held invalid and the children illegitimate. In Connelly v. Connelly,[20] a Maryland case decided in 1948, the problem was to determine which of two women was the widow of a deceased serviceman. One had been married to the deceased, and he had obtained

---

[16] See also State v. Najjar, N.J.Super. App.1949, 63 A.2d 807.

[17] Decided Nov. 12, 1946 (unreported). No opinion for publication.

[18] 1894, 79 Md. 298, 29 A. 597, 25 L.R. A. 800.

[19] Fornshill v. Murray, 1 Bland 479, 18 Am.Dec. 344.

[20] Md., 1948, 57 A.2d 276.

a divorce alleged by her to have been procured by false allegations and false testimony. After the divorce, he had married the second woman. When he died, the first wife brought a suit in equity for the annulment of the divorce. She alleged that she, as the widow, was entitled to a pension, to severance pay due the widow, and to accumulated earned pay due the deceased. The Court of Appeals of Maryland declared the first wife to be the lawful widow of the deceased. In so doing, it is clear that the court treated as invalid the second marriage of the deceased upon the suit of a person not a party to that marriage, the question before the court being whether the plaintiff was the widow entitled to property rights as such. Thus, it appears that whatever may be the rule in Maryland as to requisite parties and procedure for annulment purposes, the Maryland courts will consider and determine the validity of a divorce and subsequent marriage in an action brought to determine the property rights of an alleged widow. We note the observation made by the Court of Appeals of Maryland in January of this year. In Townsend v. Morgan,[21] that court said, "A second marriage contracted while a first marriage exists undissolved is a nullity without the passage of any judicial decree declaring it void."

There is no doubt that a Mexican divorce obtained by mail would be held invalid in Maryland,[22] and a second marriage of a party to such a divorce invalid, in a proceeding in the Maryland courts in which that question determined property rights. Thus, we think that the conclusion which the District Court drew from Ridgely v. Ridgely, supra, was erroneously drawn.

■ Appellee contends that the United States has no standing to appeal, because, she says, it is not a "party aggrieved" within the meaning of Section 101, Title 17, of the District of Columbia Code. In its answer to the complaint, the United States denied liability to Mrs. Snyder and, by way of "Counterclaim for Interpleader", prayed the court to order Dorothy Helen Reul to be made a party defendant in order to avoid a multiplicity of suits and the possibility of double liability. At the conclusion of the trial, a judgment was entered against the United States. The question is whether the United States could then appeal. In the first place, it is clear that the United States has a very real interest in the decision. It involves questions of general applicability and, as we have seen, is contrary to administrative regulations of long standing and considerable importance. It would be an odd result to leave the Government to the capacities and desires of private individual litigants in such matters. Furthermore, the United States has an interest in the correct disposition of funds it is disbursing for objectives specifically designated by Congress. While the difficulty does not arise in this particular case, since the third party is vigorously prosecuting her claim, nevertheless, if it were held that the United States has no appealable interest, the disposition of the proceeds of policies such as this would be left to such private arrangements between litigants as those particular persons might wish to make. Such results would not be consonant with the objectives sought by this legislation.

■ In the second place, and independently conclusive upon the point, the statute under which this action was brought provides, by reference to and incorporation of other acts, for appeal by the United States. This complaint is grounded upon Section 617 of an act of October 8, 1940, Part I of Title VI of which was the National Service Life Insurance Act.[23] That section provides that suits brought under it shall be subject to the conditions and limitations provided by Section 19 of the World War Veterans' Act, 1924.[24] The latter provided that procedure should be the same as that provided by Section 10

---

[21] Md., 1949, 63 A.2d 743, 745.

[22] See discussion in Slansky v. State, Md., 1949, 63 A.2d 599, 605 et seq., and in Walker v. Walker, 1915, 125 Md. 649, 94 A. 346, Ann.Cas.1916B, 934.

[23] Supra note 1.

[24] Supra note 1.

of an act of March 3, 1887.[25] And that statute authorized an appeal on behalf of the United States whenever the judgment of a trial court was "adverse to the Government." The phrase "adverse to the Government", when transposed into the procedure upon a National Service Life Insurance policy, as is done by the several statutory provisions mentioned, must mean adverse to the administrative determination in the matter; otherwise, the expression would have no meaning in these cases. Leyerly v. United States [26] is not to the contrary. In that case the Government did not appeal.

The judgment of the District Court is reversed and the cases remanded for further proceedings in accordance with this opinion.

Reversed and remanded.

[25] 24 Stat. 507. These procedural provisions appeared as part of Section 765, Title 28, of the United States Code, as it was before the revision of June 26, 1948. According to the Reviser's Notes, they "were omitted as unnecessary" in that revision.

[26] 10 Cir., 1947, 162 F.2d 79.